1
2
3
4
5
6
7                    IN THE UNITED STATES DISTRICT COURT

8                  FOR THE EASTERN DISTRICT OF CALIFORNIA

9   JOSE LUIS RIVERA,

10            Petitioner,              No. 2:05-cv-2537 FCD JFM (HC)

11       vs.

12   JEANNE S. WOODFORD,

13            Respondent.              FINDINGS AND RECOMMENDATIONS

14   _____/

15            Petitioner is a state prisoner proceeding through counsel with an application for a

16   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2002 conviction on

17   charges of murder, robbery and carjacking, and the sentence of one year plus life without the

18   possibility of parole.  Petitioner alleges he suffered ineffective assistance of trial counsel in

19   violation of the Sixth Amendment.

20                          FACTS[1]

21            On the morning of August 22, 2000, [petitioner] received a
         telephone call from his friend Alex Santana, who told [petitioner]
22            he wanted to look at a Camaro he had seen.[2]  Santana had recently

23   _____

24       [1]  The facts are taken from the opinion of the California Court of Appeal for the Third
     Appellate District in People v. Rivera, No. C042375 (September 28, 2004), a copy of which was
     lodged on March 5, 2009, as Exhibit D.
25

26       [2]  The case was tried before two juries, which heard different evidence.  The jury for
     petitioner and Santos was referred to as the "yellow jury," the jury for Camacho was referred to

                                   1

purchased a Camaro, but it had transmission problems and [petitioner] suspected Santana wanted another Camaro so he could use the parts to replace the damaged transmission on his car.

[Petitioner] called a coworker, Danny Soto, and told him he would not be going to work that day because he had to take his sick mother to Davis. [Petitioner] picked up Santana in [petitioner's] black Camaro and the two men went to breakfast.[3] After breakfast, [petitioner] contacted seventeen-year-old Santos and asked him to join them, saying, "[l]et's go to get a car." They picked him up at school, then picked up Camacho, and drove to the Sport Time Auto dealership. During the drive to the dealership, there was a discussion about taking a car from a dealership for a test drive, hitting the salesman on the head, throwing him out of the car, and taking the car.

When the four men arrived at the dealership, Santana and Camacho exited the car. At that time, [petitioner] noticed a gun tucked into the back of Santana's pants. [Petitioner] "had a feeling something was gonna go" because he and Santana had "discussed this" two days earlier when Santana said he wanted to get a gun and steal a Camaro off the street.

Santana and Camacho began looking at a 1996 Camaro and the victim, salesman Thomas Bucholz,[4] agreed to take them for a test drive in the Camaro. Camacho drove the car, Bucholz sat in the front passenger seat, and Santana sat in the back seat behind Bucholz. When they left the dealership, [petitioner] followed them in his car. Bucholz directed them to first stop at a nearby convenience store where he purchased five dollars' worth of gas. While they were waiting for Bucholz, a customer commented to Camacho that he had a nice car, but Camacho just turned his face away.

As they pulled away from the convenience store, Camacho and Santana waved at [petitioner] to follow them. Camacho drove the Camaro onto Highway 80. Shortly thereafter, Santana shot Bucholz in the back of the head, killing him, and Camacho pulled over to the side of the road where Bucholz's body was pushed out of the car.

---

as the "green jury." The [instant facts are] based solely on the evidence presented to [petitioner's] jury.

[3] A videotape of petitioner's police interview was played for the jury. A transcript of that interview is included in the clerk's transcript. (CT 728-855; 885-1009.)

[4] The state appellate court spelled the victim's name "Bucholz," but the trial court spelled it "Buchholz."

Camacho then sped away, weaving in and out of traffic, exiting the freeway at the 16th Street exit on Highway 50 where he ran a stoplight adjacent to the 16th Street off ramp of Highway 50.  A passing motorist noticed that he appeared very agitated and excited.  He then drove to a parking lot at 4th and Q Streets, where he and Santana wiped the car's exterior and interior and then jumped into  [petitioner's] car, which was in the parking lot.  The taillight on  [petitioner's] car was burnt out.

The group left the stolen Camaro in the parking lot and they drove to the waterfront at Miller Park where Santana disposed of the gun and Camacho's shirt.  The foursome then went to [petitioner's] apartment where Santana and Camacho put their bloody clothes in a bag and threw it in a dumpster.

When they were at [petitioner's] apartment, Santana asked [petitioner] to take him to 4th and Q Streets so he could burn the evidence at the scene where they left the green Camaro.  Around 1:00 p.m., [petitioner] drove Santana to a mini-mart to purchase a can of gasoline and then proceeded to 4th and Q Streets.  However, as they approached that location, they saw police officers, so [petitioner] continued.  Two blocks away, he stopped the car so Santana could get rid of the gasoline before they returned to [petitioner's] apartment.

Around 10:00 that evening, [petitioner] went to the apartment of his friend, Amber Morgan and told her he had been involved in the freeway incident that had been on the news that day.  He said he wanted to tell her something but told her not to tell anyone else. He said a friend had called him that day and asked him to drive to a car dealership so he could steal a car.  [Petitioner] said he was supposed to leave the friend at the dealership and meet up with him later.  [Petitioner] informed Morgan his friend planned to take the car on a test drive, push the salesman out of the car, and steal the car.  [Petitioner] said his friend accidentally killed the salesman.

[Petitioner] also told Morgan that when he met his friends later that day, he saw that the front of the dealership car was full of blood, and his friends asked him to help them wipe down the car. [Petitioner] told Morgan his friend had shot the salesman and pushed him out of the car.  [Petitioner] also indicated that if the police contacted him he would "tell the truth and come clean" but he would not voluntarily contact the police and "rat out" his friends.

When the news came on the television advising that the police were looking for a black Camaro with a yellow sticker[] and a broken taillight, [petitioner] said he needed to change those things on his car.  Before leaving Morgan's apartment, [petitioner] remarked that "peer pressure is a bitch."

1

2

      The following day, while [petitioner] was speaking to Danny Soto on a two-way radio,  [petitioner] told him he was in "deep shit" but he did not want to discuss it on the radio.  [Petitioner] was arrested that evening.

3

4

      [Petitioner] did not testify or present any evidence in his defense. However, his codefendants presented evidence.  Comacho testified there was no discussion or plan to steal a car, although Santana joked around about taking a car for a test drive and pushing the salesman out of the car.  Camacho did not believe Santana would carry out his plan because he was a known bully, and Camacho thought he was just joking around and acting tough.

5

6

7

8   (People v. Rivera, slip op. at 2-6.)

9                             PROCEDURAL HISTORY

10      Petitioner filed a timely appeal in the California Court of Appeal, Third Appellate

11   District.  (See Lodged Doc. A.)  On September 28, 2004, the Third District Court of Appeal

12   affirmed petitioner's conviction and sentence.  (Lodged Doc. D.)

13      On November 8, 2004, petitioner filed a petition for review in the California

14   Supreme Court.  (Lodged Doc. E.)  That petition was denied on December 15, 2004.  (Lodged

15   Doc. F.)

16      Petitioner filed the instant petition on December 14, 2005.  (Docket No. 1.)

17                                 ANALYSIS

18   I.  Standards for a Writ of Habeas Corpus

19      Federal habeas corpus relief is not available for any claim decided on the merits in

20   state court proceedings unless the state court's adjudication of the claim:

21      (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

22      determined by the Supreme Court of the United States; or

23      (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the

24      State court proceeding.

25   28 U.S.C. § 2254(d).

26   /////

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

Under the  "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")  The court looks to the last reasoned state court decision as the basis for the state court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

Petitioner claims that trial counsel provided ineffective assistance because he failed to (a) conduct an investigation of the only defense available, (b) locate witnesses or other evidence to support the theory that petitioner did not share intent with those who committed the carjacking and the robbery, and (c) conduct a reasonable closing argument.  Petitioner provided a copy of page one of a declaration from Max Herrera, the licensed investigator retained by trial counsel to investigate petitioner's case.[5]  (Reply, Ex. A.)  Mr. Herrera states he did not conduct any type of investigation as he was not instructed to do so by trial counsel, did not bill counsel,

---

[5]  This document appears to have been originally filed in connection with petitioner's appeal as it contains Case No. C 042375.  See Ex. A, lodged March 5, 2009.

5

1   and did not meet with counsel to review defense strategy.  (Id.)  Petitioner also provided

2   declarations from Victor Reynoso, Jose Rivera (petitioner), Ukau Dungca, Theodore Santos (co-

3   defendant), all of which were filed in state court in support of petitioner's motion for new trial.

4   (Reply, Exs. B-E.)  Finally, petitioner provided a copy of trial counsel's closing argument.  (Id.,

5   Ex. F.)

6          Respondent argues that the state court correctly determined petitioner was not

7   denied effective assistance of counsel.

8          The last reasoned rejection of this claim is the decision of the California Court of

9   Appeal for the Third Appellate District on petitioner's direct appeal.  The state court rejected this

10  claim in its review of the denial of petitioner's motion for new trial based upon his claim of

11  ineffective assistance of trial counsel.

12            [Petitioner] was represented at trial by Julian Macias. On his
          motion for new trial, he was represented by Donald Masuda, who
13        had represented codefendant Santos at trial.  Attached to his
          motion were several declarations, a letter, and a transcript of
14        Macias' closing argument.  In Masuda's declaration, he stated that
          he spoke to [petitioner]'s investigator who advised him he spent
15        very little time on the case and did not contact any witnesses.
          [Petitioner's] declaration indicated that he never met with the
16        investigator, he spent very little time with Macias, and Macias
          failed to prepare him or call him to testify.  He also declared that he
17        provided Macias with a list of character witnesses and witnesses
          who would have testified that Santana was known to joke around
18        about wanting to steal cars and property, although he never
          followed through on any of these stated intentions.  Declarations
19        and a letter were filed by these witnesses indicating they were
          willing to provide character evidence on behalf of [petitioner], but
20        Macias never contacted them.

21            In denying the motion, the trial court noted that much of the
          motion involved matters outside the record that were more
22        appropriately addressed in a petition for habeas corpus.  Although
          the court acknowledged it did not appear counsel "offered a
23        spirited defense" and expressed concern about counsel's failure to
          give an opening statement and ask additional questions on cross-
24        examination, the court concluded that in light of the overwhelming
          evidence of a plan and [petitioner's] two confessions, the court was
25        "not sure . . . what difference [further testimony by Amber

26

Morgan[6] or] the character evidence would have made . . . ." The court further noted it had instructed the juries on the issues of reckless indifference to human life and major participants, they deliberated for four days, and reached favorable implied findings for Santos and Camacho on those issues.[7]  Thus, the juries were aware of those issues and reached a completely different verdict as to [petitioner].  The court therefore concluded it was not reasonably likely the introduction of the new evidence would have resulted in a more favorable outcome.

We agree and find, based upon the present record, the trial court did not abuse its discretion.  [Citation.]  It is true the record provides some support for the conclusion the case may not have been vigorously investigated.  There were also several witnesses who were never contacted, but were willing to provide character evidence and evidence that Santana was a known jokester who never carried out his stated intentions.  Moreover, the record does not affirmatively disclose that counsel had no rational tactical purpose for his acts and omissions.  [Citation.]  Nevertheless, we need not reach the question whether counsel's performance was constitutionally deficient because it is not reasonably probable the newly proffered evidence would undermine the strong evidence of [petitioner]'s guilt in view of the admissions and confessions made by [petitioner] and his codefendants.

As the trial court found and as we have discussed [elsewhere in this opinion], there was overwhelming evidence of a plan to rob the car salesman of the Camaro so that Santana could render it for parts to repair his own car.  By his own admissions, [petitioner] knew of this plan and knew Santana had a gun, but did nothing to stop him or warn Bucholz.  [Petitioner] fully confessed his participation in this plan to his friend Amber Morgan and to the police.  Statements by Santos and Camacho further support the conclusion [petitioner] knew Santana intended to steal a Camaro by robbing the car salesman.

Thus, the totality of the evidence renders any evidence of [petitioner's] good character virtually meaningless and belies his present assertions he did not think Santana intended to carry out his plan or that he lacked the requisite intent to knowingly facilitate the robbery.  Moreover, in light of Camacho's testimony that

---

[6]  In a declaration by Amber Morgan, she stated when she testified that [petitioner] told her he was involved in a "plan" to carjack a vehicle from a car dealership, the word "plan" was her word, not the word used by [petitioner].

[7]  The Rivera/Santos jury convicted Santos of the lesser-included offense of being an accessory after the fact ([Cal. Pen. Code] § 32) and acquitted him of all other charges.  The Camacho jury convicted Camacho of first degree murder but found not true the two special circumstances.

nobody believed Santana's bluster because he was a known bully and jokester, the newly proffered evidence to that effect is merely duplicative of evidence heard and rejected by the jury under properly given instructions.  Likewise, even if we assume for the sake of argument that counsel's closing argument was inadequate, the deficiency was harmless in light of [petitioner's] damning confessions.

Last and contrary to [petitioner's] assertion, the fact the jury acquitted Santos of murder and Camacho of the special circumstances does not suggest [petitioner] was prejudiced by counsel's allegedly inadequate representation.  Santos, who was tried before the same jury as [petitioner], was a minor at the time of the murder.  Based upon the evidence, the jury could reasonably find Santos just went along for the ride, playing a purely passive role, and therefore did not knowingly encourage or facilitate the robbery or carjacking.[8]

Camacho, on the other hand, was tried before a different jury who heard different evidence.[9]  Moreover, he testified that he went along with Santana's plan to rob Bucholz because Santana threatened to "blast" him if he did not cooperate.  The jury could reasonably find that while Camacho aided and abetted the robbery, making him guilty of first-degree murder, he did not act with reckless indifference to human life for purposes of the special circumstances allegations.  ([Cal. Pen. Code,] § 190.2, subd. (d).)  For all these reasons, we reject [petitioner]'s claim of ineffective assistance of counsel.

(People v. Rivera, slip op. at 17-22.)

The Sixth Amendment guarantees the effective assistance of counsel.  The United

States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

---

[8]  The jury viewed a videotaped interview in which Santos told police that [petitioner] contacted him the morning of the murder and urged him to go with them to "get a car."  He thought [petitioner] and Santana were going to look at cars because they were always looking at new cars.  After he and [petitioner] left Santana and Camacho at the dealership, [petitioner] agreed to take him home, but when they saw Bucholz's body pushed out of the car, they followed the stolen Camaro to see what happened.

[9]  Camacho testified that when he and Santana were waiting for Bucholz to pay for the gasoline, he told Santana that if he wanted to take the car, they should take it "right now" before Bucholz returned, but Santana insisted that they were "going to wait until Mr. Bucholz comes back."  When Camacho told Santana he did not want to be a part of "this thing" and wanted to leave, Santana threatened to "blast" him if he didn't go along with what he wanted, and showed him his gun.  Camacho was "[t]errified for [his] life" and returned some money Santana had loaned him to buy a car, but Santana told him that did not change anything.

1   Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of

2   counsel, a petitioner must first show that, considering all the circumstances, counsel's

3   performance fell below an objective standard of reasonableness.  Id. at 687-88.  After a petitioner

4   identifies the acts or omissions that are alleged not to have been the result of reasonable

5   professional judgment, the court must determine whether, in light of all the circumstances, the

6   identified acts or omissions were outside the wide range of professionally, competent assistance.

7   Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  In assessing an ineffective assistance of

8   counsel claim "[t]here is a strong presumption that counsel's performance falls within the 'wide

9   range of professional assistance.'"  Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting

10  Strickland, 466 U.S. at 689).  There is in addition a strong presumption that counsel "exercised

11  acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d

12  695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

13          Second, a petitioner must establish that he was prejudiced by counsel's deficient

14  performance.  Strickland, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable

15  probability that, but for counsel's unprofessional errors, the result of the proceeding would have

16  been different."  Id. at 694.  A reasonable probability is "a probability sufficient to undermine

17  confidence in the outcome."  Id.  See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224

18  F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not determine whether counsel's

19  performance was deficient before examining the prejudice suffered by the defendant as a result of

20  the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of

21  lack of sufficient prejudice . . . that course should be followed."  Pizzuto v. Arave, 280 F.3d 949,

22  955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

23          Recently, the Court of Appeals for the Ninth Circuit clarified the application of

24  Strickland under the AEDPA standards set forth above:

25          "That the standard is stated in general terms does not mean the
            application was reasonable. AEDPA does not require state and
26          federal courts to wait for some nearly identical factual pattern

9

1  before a legal rule must be applied.  Nor does AEDPA prohibit a
2  federal court from finding an application of a principle
   unreasonable when it involves a set of facts different from those of
3  the case in which the principle was announced.  The statute
   recognizes, to the contrary, that even a general standard may be
4  applied in an unreasonable manner." Panetti v. Quarterman, 551
   U.S. 930, 127 S.Ct. 2842, 2858, 168 L.Ed.2d 662 (2007) (citations
5  and internal quotation marks omitted).  Where counsel's failure to
   investigate was both objectively unreasonable and prejudicial, and
6  where the state court acted unreasonably in finding to the contrary,
   we will grant a petition for habeas corpus.

7  Richter v. Hickman, _____ F.3d _____, 2009 WL 2425390 at *6 (9th Cir. 2009).

8          Defense counsel has a "duty to make reasonable investigations or to make a

9  reasonable decision that makes particular investigations unnecessary."  Strickland, 466 U.S. at

10 691.  It has been recognized that "the adversarial process will not function normally unless the

11 defense team has done a proper investigation."  Siripongs v. Calderon (Siripongs II), 133 F.3d

12 732, 734 (9th Cir. 1998)(citing Kimmelman, 477 U.S. at 384).  Therefore, counsel must, "at a

13 minimum, conduct a reasonable investigation enabling him to make informed decisions about

14 how best to represent his client."  Hendricks v. Calderon, 70 F.3d 1032, 1035 (9th Cir. 1995)

15 (quoting Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994) (internal citation and quotations

16 omitted).  On the other hand, where an attorney has consciously decided not to conduct further

17 investigation because of reasonable tactical evaluations, his or her performance is not

18 constitutionally deficient.  See Siripongs II, 133 F.3d at 734; Babbitt v. Calderon, 151 F.3d 1170,

19 1173 (9th Cir. 1998); Hensley v. Crist, 67 F.3d 181, 185 (9th Cir. 1995).  "A decision not to

20 investigate thus 'must be directly assessed for reasonableness in all the circumstances.'"

21 Wiggins, 539 U.S. at 533 (quoting Strickland, 466 U.S. at 691).  See also Kimmelman, 477 U.S.

22 at 385 (counsel "neither investigated, nor made a reasonable decision not to investigate");

23 Babbitt, 151 F.3d at 1173-74.  A reviewing court must "examine the reasonableness of counsel's

24 conduct 'as of the time of counsel's conduct.'"  United States v. Chambers, 918 F.2d 1455, 1461

25 (9th Cir. 1990) (quoting Strickland, 466 U.S. at 690).  Furthermore, "'ineffective assistance

26 claims based on a duty to investigate must be considered in light of the strength of the

1   government's case.'" Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001) (quoting Eggleston

2   v. United States, 798 F.2d 374, 376 (9th Cir. 1986)).  See also Hayes v. Woodford, 301 F.3d

3   1054, 1070 (9th Cir. 2002).  This assessment will depend in large part on a determination of

4   whether the evidence likely would have changed the outcome of the trial.  Hill v. Lockhart, 474

5   U.S. 52, 56-57 (1985); see, e.g., Lambert v. Blodgett, 393 F.3d 943, 983 (9th Cir.2004) (finding

6   no prejudice from counsel's alleged failure to investigate defense of fetal alcohol syndrome where

7   there was little chance such defense would have succeeded).

8            As noted above, petitioner was convicted of murder, Cal. Penal Code § 187,[10]

9   robbery, Cal. Penal Code § 211,[11] and carjacking, Cal. Penal Code § 215.  However, because

10  petitioner was not present at the time the Camaro was carjacked and the victim was shot and

11  thrown out of the car, the prosecution had to prove, beyond a reasonable doubt, that petitioner

12  shared culpability with the actual perpetrators as an aider and abettor in the robbery, the

13  carjacking, or the murder; in other words, petitioner was a principal[12] in one of those crimes.

14           Under California law, aiding and abetting is defined as follows:

15       A person aids and abets the commission or attempted commission
         of a crime when he or she:

16
17       (1) With knowledge of the unlawful purpose of the perpetrator, and

18       (2) With the intent or purpose of committing or encouraging or
         facilitating the commission of the crime, and

19

20       [10]  "(a) Murder is the unlawful killing of a human being, or a fetus, with malice
         aforethought."  Cal. Penal Code § 187(a).

21       [11]  "Robbery is the felonious taking of personal property in the possession of another,
         from his person or immediate presence, and against his will, accomplished by means of force or
22       fear."  Cal. Penal Code § 211.

23       [12]  "Persons who are involved in committing or attempting to commit a crime are referred
         to as principals in that crime.  Each principal, regardless of the extent or manner of participation
24       is equally guilty.  Principals include:
             1.  Those who directly and actively commit or attempt to commit the act constituting the
25       crime, or
             2.  Those who aid and abet the commission or attempted commission of the crime.
26       CALJIC 3.00 (CT 332).

> (3) By act or advice, aids, promotes, encourages or instigates the commission of the crime.
>
> A person who aids and abets the commission or attempted commission of a crime need not be present at the scene of the crime.
>
> Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting.
>
> Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting.

CALJIC 3.01 (CT 333).  The prosecutor must prove, beyond a reasonable doubt, that the aider and abettor shared the specific intent of the perpetrator with respect to the crimes of robbery and/or carjacking.  <u>People v. Beeman</u>, 35 Cal.3d 547, 560 (1984); (CT 335).  Moreover, "there must exist a union or joint operation of act or conduct and a certain specific intent and mental state in the mind of the perpetrator.  Unless this specific intent and mental state[13] exists, the crime to which it relates is not committed."  CALJIC 3.31 (CT 341).

The prosecution was also required to prove special circumstances under California Penal Code § 190.2, and the jury was instructed accordingly:

> If you find a defendant in this case guilty of murder of the first degree, you must then determine if one or more of the following special circumstances are true or not true:   (1) whether the murder of Thomas Buchholz was committed while defendant was engaged in the commission of the crime of robbery; or (2) whether the murder of Thomas Buchholz was committed while defendant was engaged in the commission of the crime of carjacking.
>
> The People have the burden of proving the truth of a special circumstance.  If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true.
>
> You cannot find the special circumstances to be true as to that defendant unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill aided and abetted or assisted any actor in the commission of the murder in the first degree, or

---

[13] The mental state required would be identified in the specific crime definition.  <u>Id.</u>

with reckless indifference to human life[14] and as a major participant,[15] aided and abetted in the commission of the crime of robbery or carjacking which resulted in the death of a human being, namely Thomas Buchholz.

A defendant acts with reckless indifference to human life when that defendant knows or is aware that his acts involve a grave risk of death to an innocent human being.

You must decide separately as to each of the defendants the existence or nonexistence of each special circumstance alleged in this case. If you cannot agree as to all the defendants, but can agree as to one or more of them, you make your finding as to the one or more upon which you do agree.

You must decide separately each special circumstance alleged in this case as to each of the defendants. If you cannot agree as to all of the special circumstances, but can agree as to one or more of them, you must make your finding as to the one or more upon which you do agree.

In order to find a special circumstance alleged in this case to be true or untrue, you must agree unanimously.

You will state your special finding as to whether this special circumstance is or is not true on the form that will be supplied.

CALJIC 8.80.1 (CT 362-63.)

To find that the special circumstance, referred to in these instructions as murder in the commission of a robbery or carjacking, is true, it must be proved:

1. The murder was committed while a defendant was engaged in or was an accomplice in the commission or attempted commission of a robbery or carjacking; and

---

[14] The California Supreme Court has defined "reckless indifference to human life": "[W]hen considered in its entirety-as the phrase is presented to the jury-"reckless indifference to human life" is commonly understood to mean that the defendant was subjectively aware that his or her participation in the felony involved a grave risk of death." People v. Estrada, 11 Cal.4th 568, 577, 46 Cal.Rptr.2d 586 (1995).

[15] A California appellate court has defined "major participant": "In this context, we believe the phrase "major participant" is commonly understood and is not used in a technical sense peculiar to the law. The common meaning of "major" includes "notable or conspicuous in effect or scope" and "one of the larger or more important members or units of a kind or group." (Webster's New Internat. Dict., supra, p. 1363.)" People v. Proby, 60 Cal.App.4th 922, 933-34, 70 Cal.Rptr. 2d 706 (Cal.App. 2 Dist. 1998).

> 2.  The murder was committed in order to carry out or advance the commission of the crime of robbery or carjacking or to facilitate the escape therefrom or to avoid detection.  In other words, the special circumstance referred to in these instructions is not established if the robbery or carjacking was merely incidental to the commission of the murder.

CALJIC 8.81.17 (CT 364).

Here, because petitioner was not present during the taking of the Camaro or the shooting of Mr. Buchholz, it was incumbent upon defense counsel to focus on whether petitioner (1) shared intent with Santana, the shooter and the person who would benefit from the stolen car; (2) was one of the more important members of the four who participated in the actions resulting in the victim's death; and (3) was aware that his involvement in the underlying felony involved a grave risk of death.

Review of the record confirms that defense counsel's representation of petitioner was "outside the wide range of professionally competent assistance." Strickland, at 690.  First, defense counsel failed to investigate witnesses or other evidence that might support the defense that petitioner did not share Santana's specific intent to commit these crimes.  Second, defense counsel failed to call any witnesses on petitioner's behalf, failed to make an opening statement, failed to make clear to the jury just what petitioner's defense was, failed to present a persuasive closing argument, and failed to put petitioner on the stand (petitioner had no consequential prior criminal record).  All of these failures accumulate to render defense counsel's performance ineffective and far below the range of professionally competent assistance.

Petitioner has demonstrated that defense counsel performed no investigation and did not interview any witnesses who might testify on behalf of petitioner.  Petitioner has presented declarations by potential witnesses who claim they were prepared to testify but were not called by defense counsel to testify.  For example, Victor Reynoso was prepared to testify that he

/////

1        saw Alex Santana almost on a daily basis, during which he would
     always jokingly talk about stealing someone's car, girlfriend, or
2        property.  [He] never took [Santana] seriously when he was talking
     about stealing, and [he has] never seen him steal or take anything.
3        [Santana] never followed through on any of these plans as far as
     [he] [knew].

4

5   (Pet'r's Reply, Ex. B.)  Reynoso knew petitioner for about 8 years and knew Santana for about

6   two to three years prior to August 22, 2000.  (Id.)

7             Ukau Dungca, another potential witness, approached defense counsel during trial

8   and offered to testify, but, despite defense counsel's assurances, was not called to testify or to

9   prepare to testify.  (Id., Ex. D.)  Dungca also knew petitioner for 8 years and knew Santana for

10  two years preceding August 22, 2000.  (Id.)  Dungca would have testified that Dungca

11       had occasion to be around Alex Santana on about 100 times these
     past years that [Dungca] knew him.  During these times, he was
12       always shooting his mouth off, stating such things as "wanting to
     take a car," "wanting [to] take someone's girl," or "wanting to take
13       some property."  Until the carjacking in August 2000, Alex
     Santana never did take those things he talked about and everyone
14       knew he was just a big jokester.

15       On about 20 occasions, [petitioner] and I went to various car lots
     on Fulton Avenue to check out cars.  [Petitioner] and I had a strong
16       common interest in automobiles.

17  (Id.)

18            Because petitioner's role in these crimes was attenuated, it was important for

19  defense counsel to investigate the facts, interview witnesses and, at the very least, put on some

20  witnesses who could speak to his client's lack of shared intent, particularly if counsel were going

21  to make an informed, strategic decision not to put petitioner on the stand.  The testimony of

22  Dungca and Reynoso, would have supported a lack of shared intent theory.  Although the state

23  court found this testimony would have been cumulative of other evidence admitted by Santos'

24  defense counsel, petitioner's defense counsel did not make clear that petitioner thought Santana

25  was joking or that he didn't believe or know that Santana was going to actually steal the car on

26  this occasion.  Moreover, the trial court allowed the prosecution to put on three witnesses to the

1   wiping down of the stolen Camaro, despite Camacho's attorney's objection that the evidence was

2   cumulative.  Arguably, petitioner's defense counsel would have been permitted to call at least

3   two witnesses on this issue, particularly Dungca who would also testify to petitioner's strong

4   interest in cars.

5          Defense counsel also could have subpoenaed phone records to investigate whether

6   the phone records confirmed any of the defendants' statements to the police.

7          The failure to call petitioner to the stand cannot be deemed strategic because the

8   decision was not an informed one.  Because defense counsel failed to investigate petitioner's

9   case, his decision not to allow petitioner to take the stand was also ineffective.  The yellow jury

10  viewed the videotaped interviews of Amber Morgan, petitioner, Ted Santos and a portion of

11  Anthony Camacho.  Given the conflicts in petitioner's statements to police, and his lack of a

12  consequential criminal record, it was critical for petitioner to get on the stand and explain his

13  actions to the jury.  Petitioner wanted to testify, but defense counsel failed to prepare him to

14  testify and would not allow him to take the stand.  (Pet'r's Reply, Ex. C.)  Petitioner could have

15  testified as to how he perceived Santana's statement that he was, as in the past, going to steal that

16  car.  Petitioner could have testified as to Santana's history of threatening to take cars, which

17  would have been supported by the testimony of Reynoso and Dungca.  The failure to call

18  petitioner to the stand left the issue of petitioner's shared intent muddied and allowed the jury to

19  agree with the prosecution's view of the evidence.

20         Petitioner also argues that defense counsel failed to present a comprehensive

21  closing argument which also constituted ineffective assistance of counsel.  While the closing

22  argument certainly could have been better, and more organized, defense counsel attempted to

23  attack the credibility of Camacho, who had inculpated petitioner in his testimony.  The jury

24  apparently credited Camacho's testimony, as evidenced by their request for readback of his

25  testimony (CT 422-23), and their hung jury on the special circumstances charge, so it was

26  appropriate for defense counsel to attack this testimony in the closing argument.  Defense

counsel also focused on whether there was a plan and tried to persuade the jury that if there was a plan, it was between Camacho and Santana, not among Camacho, Santana and petitioner. (Reply, Ex. F at 9-10, 12.)  However, the closing argument was lacking in that it failed to clarify for the jury just what the defense strategy was, and did not focus on the key issue of shared intent, which was critical, and which was a defense that resulted in a winning strategy for co-defendant Santos, who also did not take the stand.

The main question here, however, even assuming defense counsel was ineffective, is whether petitioner suffered prejudice under Strickland.  That is, if defense counsel had investigated, called witnesses, and put petitioner on the stand, is there a "reasonable probability" that the "result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.

This court has reviewed the record and finds it was not unreasonable for the state appellate court to find petitioner failed to demonstrate prejudice under Strickland.

Petitioner contends that the fact that Santos was acquitted using a defense of lack of shared intent demonstrates there is a reasonable probability petitioner's outcome would have been different had his defense counsel used the same defense.  Indeed, petitioner states "[f]actually, the only difference between Mr. Rivera and Mr. Santos, the accessory, was that because he had an automobile, he happened to be the person who gave the other a ride that day to the car lot."  (Pet'r's Reply at 12.)  This statement is not supported by the record.

There is ample evidence in the record that Mr. Santos, a minor, was "in the wrong place at the wrong time" (CT 838) and was not privy to discussions concerning stealing a car. (CT 683-84; "I didn't know there was a plan." (CT 697).)

As for petitioner, Amber Morgan told Detective Burgoon what petitioner divulged to her only hours after the murder:

/////

I was involved. . . .

17

1
2
3
4

> My friends called me and told me that they wanted me to go with them to this car dealership and, um, take the car out for a test drive, kick the guy out of the car, take the car, take the transmission out . . . and the, um, ditch the car and then jump in the car so they can take off.  So I said, "All right," you know, I'll drop them off at the dealership  and then meet them later when . . . they're done doing whatever they're going to do.

5  (CT 859.)

6       Petitioner eventually conceded to Detective Burgoon that he saw Santana had a

7  gun tucked in the back, and admitted he was not surprised because he had seen Santana have

8  guns before.  (CT 814.)  Two days before the murder Santana told petitioner he wanted to get a

9  gun and steal a Camaro off the street.  (CT 819-20.)

10       The morning of the murder, Santana called petitioner and told him he wanted to

11  look at some cars.  Petitioner stated that "[t]heir[16] plan was just that they were gonna go look at

12  cars.  That's what they had told me."  (CT 819.)  When asked whether they didn't fill him in on

13  what they were up to, petitioner responded, "I had a feeling something was gonna go . . .

14  [b]ecause we had discussed this before."  (CT 819.)  Petitioner explained Santana and Camacho

15  were just discussing "[t]hat they were gonna go to a dealership and that they were gonna go ask

16  some guy and test-drive a car, and that they were gonna throw him out of the car."  (CT 820.)

17  Petitioner qualified, however, that "they never said they were gonna do it at that point."  (CT

18  821.)  Petitioner admitted he was peer pressured; that if he knew they had a gun, he would have

19  left both of them, but when he saw the gun, he thought they would have talked about it before

20  doing it.  (CT 821.)

21
22
23
24

> [T]hey had discussed about it that they were just gonna test drive a car, take the guy, and throw him somewhere far (unintelligible) where the dealership was, you know, scare him.  But they never discussed about actually shooting the guy.  Uh – that, I know for a fact, that was never planned.  They had never – they – they just said, "We're gonna take the guy.  We're gonna hit him on the head and throw him out.  Take the car.

25  (CT 822.)

26       [16]  In this context, "their" means Santana and Camacho.  (CT 818-19.)

1    During his police interrogation, Camacho also stated that while the four of them

2 were driving to the car dealership, they discussed a plan to steal a car by pushing the salesman

3 out on the freeway while petitioner followed them in his car.  (RT 1170.)

4    Petitioner admitted following the teal Camaro away from the car dealership and

5 on to the freeway.  Ted Santos confirmed that petitioner and he saw the salesman get pushed out

6 of the teal Camaro.  (CT 674.)  Santos also confirmed that the teal Camaro then passed

7 petitioner's car and petitioner followed the teal Camaro.  (CT 676.)

8    Petitioner suggested to Detective Burgoon that Santana wanted the teal Camaro

9 for its transmission.  (CT 828.)  He said they had discussed the fact that Santana's transmission

10 had given out while they attended the state fair.  (CT 825.)

11    Santos told Detective Kingsbury that "the plan was, I guess, for them – for

12 Anthony [Camacho] and Alex [Santana] to go in the car and scare the guy and so they could take

13 the car and to get parts from it."  (CT 702.)

14    Ultimately, petitioner admitted picking up Santana and Camacho from the stolen

15 Camaro and driving them to Miller Park, where Santana disposed of the remaining bullets, his

16 gun, and Camacho's bloody shirt, and taking them to petitioner's apartment where Santana

17 disposed of his bloody clothing in a white plastic trash bag into the apartment's dumpster.

18 Petitioner even went with Detective Burgoon in between interviews to show him all the places he

19 had taken Santana and Camacho and some pieces of evidence were retrieved during that drive.

20 Camacho did the same with Detective Keller.

21    The record demonstrates there was more than enough evidence to support the

22 jury's finding that petitioner aided and abetted the robbery and carjacking of Buchholz, and that

23 petitioner was vicariously liable for the murder under the natural and probable consequences

24 doctrine because the murder was a reasonably foreseeable consequence of the robbery and

25 carjacking.  Having additional testimony that Santana was a bully or a jokester, would not have

26 changed the outcome given the strong evidence against petitioner.  The jury had before them

1 evidence that Santana was a bully and that he always talked big but didn't follow through.  In

2 light of the thorough aiding and abetting and specific intent jury instructions given the jury, it is

3 clear they believed petitioner held the specific intent to carjack the car from the salesman, and

4 found petitioner was aware Santana intended to push him out of the car.  The act of hitting him in

5 the head and pushing him out of the car, or carjacking the car with a gun, supported their finding

6 that petitioner was aware of the grave risk of danger present in this undertaking.

7       Moreover, petitioner has failed to provide a declaration setting forth exactly what

8 he would testify to if he took the stand.  In his declaration, petitioner states:  "I do not believe that

9 I had the necessary shared intent and would have testified to such." (Pet'r's Reply, Ex. C.)  This

10 generic statement sheds no light on what facts petitioner would present at trial to support a lack

11 of shared intent defense.  For example, petitioner does not declare that he thought Santana was

12 kidding and wouldn't carjack the teal Camaro when petitioner dropped him off at the car lot.

13 Petitioner needed to provide specific facts to support his theory that he did not share Santana's

14 intent given the damning evidence already in the record.

15       The fact that Camacho was not convicted of special circumstances, where he was

16 the driver of the vehicle in which Santana shot the victim and pushed the victim from the car,

17 does not change this court's view of the evidence.  The hung jury in Camacho's case was likely

18 caused by Camacho's testimony that he encouraged Santana to carjack the car while the car

19 salesman was in paying for the gas, and Santana's alleged threat to "blast him" if he didn't go

20 along with Santana's plan, both during the carjacking and after.  Petitioner was not present in the

21 car and thus was not privy to this threat or the attempted withdrawal from the plan.

22       The lack of prejudice under <u>Strickland</u> is further supported by review of the jury's

23 questions posed during their deliberations.  On August 2, 2002, petitioner's jury requested read

24 back of testimony by Alexander Gonzales, Margaret Santos, Angelo Mendizalo, and Anthony

25 Camacho. (CT 422.) While Santos and Mendizalo's testimony was pertinent to deliberations for

26 defendant Santos, the testimony of Gonzales and Camacho was relevant to deliberations for

petitioner.  Later on August 2, 2002, the jury requested further read back of Camacho's testimony "specifically regarding going to Mr. Perry's Restaurant after the fair and related cross-examination."  (CT 423.)

Some of Alexander Gonzales' testimony was helpful to petitioner.  Gonzales described Santana as a bully, overbearing, wanting to be in charge, and able to make people do things.  (RT 679-80; 688.)  For example, Santana made Gonzales buy pizza in high school.  (RT 680.)  Gonzales stated that petitioner never discussed a specific car and carjacking at a specific time for a specific part.  (RT 675.)

But the testimony of Alexander Gonzales was also damaging to petitioner.  Gonzales testified that he and petitioner discussed fixing up petitioner's car.  (RT 654.)  Gonzales said petitioner wanted to put some music in, get nice wheels, and fix the top.  (RT 655.)  He stated that petitioner, Santana and he discussed six speed transmissions.  (RT 655.)[17]  On cross-examination, the following exchange took place:

> MR. MACIAS:  You said earlier, that is, this morning, when you were asked about a six speed transmission, that [petitioner] had expressed a desire to get one; do you recall that?
>
> MR. GONZALES:  Yes.
>
> MR. MACIAS:  And can you explain the context of that discussion?
>
> MR. GONZALES:  Just said it would cost a lot of money to get a six speed put in his car, and he would like it to make his car faster, but just had to buy his exhaust and make it faster with the automatic instead of a six speed.
>
> MR. MACIAS:  Now, the teal Camaro that you knew about from Sport Time Auto Sales, do you recall that –
>
> MR. GONZALES:  Yes.

---

[17]  The testimony regarding transmissions was subject to a limiting instruction, attributable only to petitioner and Santana.  (RT 656.)

1        . . .

2      MR. MACIAS:      Do you recall if that teal Camaro was a six
speed or an automatic transmission?

3

4      MR. GONZALES:     Six speed.

5 (RT 681-82.)  Gonzales confirmed he and petitioner often talked about cars and often discussed

6 improving their cars.  (RT 671.)

7         Mr. Masuda, defense counsel for defendant Santos, tried to limit the impact of

8 Gonzales' testimony:

9      MR. MASUDA:     This is . . . you speaking now, okay.

10                  "They just talk about like, I want this car with those rims,
and I wonder how I[] would get it, you know, wonder – you

11                  know, they just like to wonder how they would get it, but,
you know, they don't know how to steal cars, and I think

12                  that's why they did this because they didn't have, you
know, didn't have the mentality to go and steal a car, you

13                  know, at nighttime."

14                  And the officer said:  "So they didn't know how to" --

15                  You said, "Yeah, hot wire."

16                  And then the officer said, "Hot wire a car or something."

17                  You said, "Nothing like that."

18                  "Is that what you're telling me?"

19                  You say, "Yeah, Yeah."

20                  And then the officer says, "Okay.  They talk about trying to
get cars."

21                  "Yeah.  Trying to get cars" was your response.

22

23                  Then the officer said, "Now, who – who are we talking
about in particular?" . . . .

24                  And your response was:  "Jose and Alex."

25                  And then the officer stated, "Jose and Alex," in a question
form to you?

26

1    And you said, in response, "Alex.  Mostly Alex."

2    Do you remember giving those – or being asked those
     questions and giving those responses?

3

4    MR. GONZALES:    Um – pretty sure.

5    (RT 284-85.)  On re-cross, petitioner's defense counsel was able to confirm that Gonzales denied

6    knowing petitioner and Santana had ever "ripped off any cars" or "stripped any parts off any

7    cars."  (RT 690.)  On further redirect, the prosecutor asked Gonzales whether they talked about

8    stealing cars, Gonzales replied:  "Didn't talk about stealing cars.  They talked about how you

9    steal a car, or how you do something, how do you do this."  (RT 690-91.)

10           As with Gonzales, parts of Camacho's testimony were also beneficial to

11   petitioner.  Camacho confirmed Santana was a "big bully" (RT 1083), and "could take this girl

12   from this guy," or "take this car from this guy if [he] wanted to."  (RT 1088.)  Santana talked

13   about taking a car, but Camacho didn't believe he would do it.  (RT 1087.)  Camacho said he and

14   Santana talked a lot about cars.  (RT 1085.)  Camacho denied there was "anything else said by

15   [Santana] inviting either [Camacho] or [petitioner] to join with [Santana] in some kind of plan"

16   to steal a car.  (RT 1096.)

17           Camacho's testimony was even more damaging to petitioner than was Gonzales'

18   testimony.  Camacho explained he wanted to get a different car, but he did not have the money to

19   do so.  (RT 1086.)  He confirmed Santana talked a few times about carjacking a car.  (RT 1087.)

20   On the day of the murder, Santana called Camacho at work and asked Camacho for a fake

21   driver's license Camacho had previously found.  (RT 1091.)  Camacho went home to look for the

22   license and ran into Santana at the local gas station.  (RT 1092.)   He denied giving Santana the

23   /////

24   /////

25

26

23

1  license.[18]  (Id.)  Santana asked Camacho if he wanted to go look at cars, but Camacho declined

2  because he had no money.  (RT 1093.)  Santana then loaned him $1,500.00 for a down payment.

3  (RT 1093.)  Camacho then got into petitioner's car with Santana and Santos.  (RT 1094.)

4  Camacho testified that during the drive, Santana "was smiling, joking around

5  telling us, just talking outloud, trying to be a tough guy, saying how he should take a car for a test

6  drive and push the guy out."  (RT 1096.)  Camacho denied believing Santana, stating he thought

7  Santana was "trying to be a bully, big tough guy again."  (RT 1096.)  Camacho denied seeing a

8  gun during the drive to the car lot, but confirmed that once Santana got out of the car, he saw

9  Santana "stuffing the gun behind his pants."  (RT 1097.)  Camacho admitted getting scared, but

10  denied thinking anything was going to happen.  (RT 1097.)

11  Camacho testified that after attending the fair with petitioner, Santana and Santos,

12  they went to Arden Fair Mall, then went to Perry's restaurant.  (RT 1151.)  (This was the Friday

13  before the murder.)  Camacho confirmed, however, that he had told the detective who

14  interviewed him after his arrest that he had not been to Perry's restaurant on the morning of the

15  murder.  (RT 1151.)  The prosecutor attempted to get Camacho to testify as to what was

16  discussed at Perry's, but Camacho claimed not to remember what happened at Perry's.  (RT

17  1151-53.)

18  The prosecutor confronted Camacho with his prior statement to the detective:

19  MR. NORGAARD:  Did you have a conversation about taking a
20  car off a car lot prior to August 22nd with
   Alex Santana and Ted Santos?

21  MR. CAMACHO:  Not that I remember.

22  MR. NORGAARD:  Do you remember Detective Keller asking you this
23  question:

   . . .

24

---

25  [18]  Petitioner's jury did not hear Detective Keller's testimony that he had found the fake
   license stuck under a cushion in the living room sofa in petitioner's apartment.  (RT 934; RT
26  536.)

1    "Well, I think there's some shit said before this thing
     happens about what the plan is, okay?

2
     Because I don't believe it just went down like you're telling
3    me.  I think you guys talked about it, and you better tell me
     right now what you talked about."
4
     "Mr. Camacho:  No.  We – we did – we talked about stuff
5    like this before."

6    "Detective says:  When?

7    And your answer.  "Um – before.

8    And the detective says:  "When?"

9    And you say:  "Just the other day."

10   Detective says:  "Okay.  The other day when?"

11   And you say:  "Like a day or two ago."

12   Detective says:  "Day or two ago?  What did you talk
     about?

13
     You say:  "We talked about taking a car off of a parking
14   lot."

15   Detective Keller:  "Off a store parking lot?"

16   Your answer:  "No."

17   Detective Keller:  "Or Off a car lot?"

18   Your answer:  "Car lot."

19   Do you remember that?

20   MR. CAMACHO:    I am starting to remember.

21   MR. NORGAARD:    Detective Keller, page 101, line three:
                     "Did he say he was going to take it," referring to Alex
22                   Santana?

23   Your answer:  "He didn't tell me specifically he was going
     to take it."

24
     Detective Keller:  "But he said he wanted it?"
25
     And your answer:  "He said he wanted it."
26

25

1   (RT 1165-66.)  The prosecutor asked Camacho to confirm his description of what took place

2   during the drive to the car lot on the day of the murder:

3               MR. CAMACHO:      "That they're doing – that – well, we weren't even talking
                                   about it at that – at that time until we go down, down the –
4                                  in the freeway."

5                                  Detective Keller:  "Okay."

6                                  Your response:  "And we're on the way there.  I didn't
                                   know where we were going and they start talking about,
7                                  'Yeah, this is the plan.' "

8                                  I said, "What plan?"

9                                  And they said, "Yeah, we're going to jump in this car."

10                                 Detective Keller:  "Who is saying this?"

11                                 Your answer:  "Alex."

12                                 Detective Keller:  "Okay."

13                                 Your response:  "We're going to jump in the car and test
                                   drive it.  And then we're going to stop on the freeway, and
14                                 then push him – push him out, and [petitioner] is going to
                                   follow."

15

16  (RT 1170-71.)  When Camacho was asked whether he remembered those statements, he stated he

17  did not, and denied there was a plan.  (RT 1171.)

18              Thus, the jury's focus on the testimony of Gonzales and Camacho during their

19  four days of deliberation, also supports this court's view that it is not reasonably probable that

20  had petitioner's defense counsel been more effective, a different outcome would have resulted.

21              The state court properly applied Strickland and found that even assuming trial

22  counsel's performance was deficient, petitioner could not demonstrate prejudice under

23  Strickland.  Notwithstanding the declarations provided here, petitioner has again failed to

24  demonstrate prejudice.  There was evidence of a plan to rob the car salesman of the Camaro

25  because Santana needed parts to repair his own vehicle and petitioner's interest in fixing up his

26  own car, perhaps with parts from the stolen vehicle.  (RT 655, 690-91.)  Petitioner's own

26

admissions to police and to Amber Morgan (CT 859, RT 598-99), and statements by Santos (CT 702.1) and Comacho (CT 114, RT 1170) demonstrated petitioner knew Santana intended to steal a Camaro from a car salesman and push him out of the car, yet he drove Santana to the car lot anyway.  There was also inferences to be drawn from the evidence that petitioner was involved in discussions on how to steal a car, as well as discussions in the car on the way to the car lot about carjacking the vehicle, hitting the victim in the head, and pushing the victim out of the car. Finally, his actions in concealing the murder spanned different locations and time frames, from the initial rescue of the actual carjackers, to their trip through Miller Park to dispose of evidence, to his own apartment to also dispose of more evidence, and to take Santana to his car in Lodi.

This court is not persuaded that more investigation into a better defense, more witnesses, or a better closing argument would have changed the outcome here, because the jury was made aware of Santana's reputation as a bully, and other witnesses' testified that they did not believe Santana would really commit the crime.  This was a complex case with multiple defendants pointing their fingers at each other, but primarily at Santana, who was a fugitive at the time.  The jury, properly instructed, heard all the evidence, conflicting and otherwise, and was tasked with assessing the witnesses' credibility.  In light of the above, this court finds it is not reasonably probable that but for trial counsel's unprofessional errors, the result of this case would have been different.

The state court's rejection of petitioner's ineffective assistance of counsel claims was neither contrary to, nor an unreasonable application of, controlling principles of United States Supreme Court precedent.  This petition should be denied.

For the foregoing reason, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written

1  objections with the court and serve a copy on all parties.  Such a document should be captioned

2  "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that

3  failure to file objections within the specified time may waive the right to appeal the District

4  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

5  DATED:  September 14, 2009.

6

7

8  UNITED STATES MAGISTRATE JUDGE

9

10  001; rive2537.157